Peggy GREER, Appellant,

v.

PROFESSIONAL FIDUCIARY, INC., Respondent,

Wells Fargo Bank, N. A., et al., Respondents,

Ruth Ostrom, Respondent.

No. A10–716.

Court of Appeals of Minnesota.

Jan. 4, 2011.

David E. Bland, Andrew J. Pieper, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, for appellant.

Mark Solheim, Paula Duggan Vraa, Troy F. Tatting, Larson King, LLP, St. Paul, MN, for respondent Professional Fiduciary, Inc.

Thomas H. Boyd, Erin A. Oglesbay, Winthrop & Weinstine, P.A., Robert A. McLeod, Lindquist & Vennum, P.L.L.P., Minneapolis, MN, for respondents Wells Fargo Bank, N.A. and Wells Fargo Investments, LLC.

Kelly A. Putney, Charles E. Lundberg, Bassford Remele, A Professional Association, Minneapolis, MN, for respondent Ruth Ostrom.

Diane B. Bratvold, Andrew M. Baese, Briggs & Morgan, P.A., Minneapolis, MN, for amicus curiae Probate and Trust Law Section of the Minnesota State Bar Association.

Mary R. Watson, William M. Hansen Associates, PLLC, Minneapolis, MN, for amicus curiae Minnesota Association of Guardianship and Conservatorship.

Considered and decided by HUDSON, Presiding Judge; JOHNSON, Chief Judge; and LARKIN, Judge.

## OPINION

HUDSON, Judge.

Appellant, a formerly incapacitated person, challenges the actions taken by respondents, who are her former conservator, her former guardian, and her former guardian's counsel, while she was under the jurisdiction of the probate court. The district court dismissed appellant's claims against respondent-conservator and respondent-guardian to the extent they were based on actions taken during the probate-court proceedings. The district court also entered judgment on the pleadings in favor of respondent-guardian's counsel because appellant failed to articulate a viable theory of liability. For the reasons stated below, we affirm.

## FACTS

From March 2005 to July 2007, appellant Peggy Greer, who is now 87 years old, was under a conservatorship and a guardianship. Respondent Wells Fargo (WF) was Greer's conservator,[1] and respondent Professional Fiduciary, Inc. (PFI), was Greer's guardian. Respondent Ruth Ostrom became PFI's attorney in April 2006 and represented PFI during and after the guardianship. On July 6, 2007, the probate court determined that Greer's capacity was restored and granted Greer's petition to terminate the conservatorship and guardianship.

In April 2009, Greer brought this civil action against WF, PFI, and Ostrom. She contended that WF and PFI were liable in tort for conduct that occurred during and after the conservatorship and guardianship and that Ostrom was liable in tort for conduct that occurred after the guardianship. Specifically, Greer sought compensatory damages against WF and PFI for breach of fiduciary duties, negligence, and intentional and negligent infliction of emotional distress. Greer also sought compensatory damages against Ostrom for breach of fiduciary duty in her capacity as PFI's attorney. WF and PFI moved to dismiss the complaint, and Ostrom moved for judgment on the pleadings. The district court granted the motions of WF and Ostrom in full and granted PFI's motion in part. Greer agreed to dismiss the remaining claims against PFI without prejudice, and the district court entered judgment in favor of WF, PFI, and Ostrom. This appeal follows.

### A. Conduct of WF and PFI during the conservatorship and guardianship

In July 2004, Greer's daughter Judith Wyrk filed a petition for appointment of a conservator and a guardian for her mother. In January 2005, the probate court heard Judith's petition. Both Greer and Judith[2] appeared with counsel and reached a settlement whereby the probate court was to appoint WF as conservator and PFI as guardian.

In March 2005, the probate court issued an order finding that Greer was incapacitated and that she was unable to understand and acknowledge her condition fully. The probate court noted that she had been hospitalized twice and needed assistance with activities of daily living. The probate court found that Greer was unable to manage her personal or financial affairs. The probate court stated that Greer was unable to manage her finances, that she would be receiving a significant inheritance, and that her estate needed to be protected to ensure its availability for her long-term care.

The probate court appointed WF as conservator of Greer's estate and granted WF a number of conservatorship powers, including the powers to pay reasonable charges for Greer's support, to pay debts out of her estate, to manage her estate, to approve or withhold approval of any contract made by Greer, except for necessities, and to apply for any public benefits on her behalf. The probate court also

---

1.  Greer contends that two Wells Fargo entities—Wells Fargo Bank (WFB) and Wells Fargo Investments (WFI)—served as her conservators. WF counters that Greer has not pleaded facts sufficient to establish that WFI was her conservator. The district court agreed and dismissed WFI from this action. Greer appeals this decision here. But it is irrelevant to our decision whether Greer has stated a claim against WFB, WFI, or both. For these reasons, we use the collective term WF to refer to Greer's conservator.

2.  To avoid confusion, Greer's children are referred to by their first names.

appointed PFI as guardian of Greer's person and granted PFI a number of powers, including the powers to establish Greer's place of abode; to provide for food, clothing, and shelter; to consent to medical treatment; and to exercise supervisory authority over Greer. The order informed Greer of her right to appeal the appointment of a conservator and a guardian pursuant to Minn.Stat. § 525.71(a)(2) (2010). Greer did not exercise this right.

In September 2005, Greer and her son Terry filed a joint petition to replace PFI as guardian on the grounds that (1) PFI was not a neutral guardian because PFI's former attorney was also Judith's attorney; (2) PFI was simply implementing Judith's wishes; and (3) PFI was not taking sufficient measures to return Greer from a costly rehabilitation center to her home. No evidentiary hearings appear to have been held on the joint petition. Instead, in September 2006, approximately one year after the joint petition was filed, Greer's new counsel, who filed a notice of substitution of counsel in May 2006, submitted a letter to the court stating that the parties had reached an agreement in principle, that the matter could be stricken from the trial calendar, and that a stipulation would be forthcoming. No stipulation was ever filed, nor was the petition dismissed.

During 2006, WF and PFI filed several reports, accounts, and petitions informing the probate court about Greer's condition and the status of her estate, and seeking the probate court's permission to take various measures regarding Greer's estate. In April 2006, PFI filed its first personal well-being report (April 2006 report) in which it stated that there had been "no change" in Greer's mental, physical, and social condition or in her living arrangements, that her services were "very good," and that there was "no change" in its recommendations regarding the guardianship and the scope of the guardianship. See Minn.Stat. § 524.5–316(a) (Supp.2009) (describing contents of personal well-being report).[3] PFI also provided Greer with a notice of rights in which it notified her of the right to request (1) a change to her residence; (2) removal of PFI as guardian; or (3) modification or termination of the guardianship. Greer did not make any such requests.

In June 2006, WF filed its first annual account (FAA).[4] The FAA listed Greer's assets and income as totaling $371,976.76, which included an inheritance, IRA distributions from M & I bank, and social security benefits. The FAA also listed Greer's

---

**3.** Greer was under conservatorship and guardianship from 2005 to 2007. Since 2007, the legislature has twice amended the conservatorship and guardianship statutes. 2010 Minn. Laws, ch. 254, §§ 1–13, at 452–65; 2009 Minn. Laws, ch. 150, §§ 1–16, at 2028–41. These amendments did not substantively change the statutory provisions at issue here. See id. Ordinarily, courts apply the version of statutes in effect when they decide a case. See Interstate Power Co. v. Nobles Cnty. Bd. of Comm'rs, 617 N.W.2d 566, 575 (Minn.2000) (stating the general rule that "appellate courts apply the law as it exists at the time they rule on a case" unless doing so would affect vested rights or result in manifest injustice). But the 2010 amend-ments apply only to "petitions filed and protective orders issued or renewed on or after August 1, 2010." 2010 Minn. Laws, ch. 254, § 13, at 465. In Greer's conservatorship and guardianship proceeding, the last petition was filed in April 2007 and the final order issued in October 2007. Because the 2010 amendments do not apply, we cite the 2008 and 2009 versions of the conservatorship and guardianship statutes. For all other relevant provisions of the probate statutes, however, we cite the 2010 version.

**4.** An account lists a protected person's assets, income, and expenditures. Minn.Stat. § 524.5–420(b) (Supp.2009).

expenses as totaling $298,055.79, which included $83,220.13 for Greer's stay at Hillcrest of Wayzata and $1,705.86 for medical care through Fairview Home Care & Hospice. The FAA also listed Greer's assets on hand as WF investment accounts and a judgment, all of which totaled $73,920.97. Greer did not file any objections, and the probate court allowed the FAA. Greer did not appeal this order even though it was appealable. *See* Minn.Stat. § 525.71(a)(9) (2010) (permitting appeal of order allowing or refusing to allow an account when amount in controversy exceeds $100).

In November 2006, WF petitioned to obtain a reverse mortgage loan on Greer's home to pay for her long-term care and satisfy other outstanding debts. Again, Greer did not file any objections and, following a hearing, the probate court directed WF to obtain the reverse mortgage. Greer did not appeal this order, even though it also was appealable. *See* Minn. Stat. § 525.71(a)(3) (2010) (permitting appeal of an order authorizing or refusing to authorize the sale, mortgage, or lease of real estate).

Later, in December 2006, Greer filed a petition for appointment of successor guardian and successor conservator, and in January 2007, she filed an emergency petition seeking the same relief. Greer argued that WF was mismanaging her assets and exploiting her financial situation; that PFI had obtained excessive and unwarranted medical care; and that both WF and PFI were denying Greer access to her financial and medical records. Greer particularly criticized WF's efforts to obtain a reverse mortgage on her home and PFI's efforts to keep her in a nursing home. Greer requested that WF be terminated as conservator and PFI be terminated as guardian and that her son Michael be appointed successor guardian and her son Terry be appointed successor conservator.

On March 2, 2007, the probate court heard the following matters: (1) Greer's petition for appointment of Michael as successor guardian and Terry as successor conservator; (2) Greer's subsequent petition for restoration of capacity; (3) Judith's petition objecting to restoration and seeking her own appointment as successor guardian and conservator; and (4) WF's second annual account (SAA). Greer's new counsel, who appears to have been appointed in December 2006 or early 2007, appeared; Judith appeared personally and by counsel; and WF and PFI appeared through counsel. Greer did not appear personally, and her sons Michael and Terry did not appear. Through counsel, Greer requested a continuance, which was opposed by WF, PFI, and Judith. The probate court denied the request, noting that the matter had a long history of continuances and last-minute changes in attorneys, that the cost of granting a continuance was prohibitive to the parties, and that there was no just cause for granting one.

The probate court dismissed all of the pending petitions without prejudice. The probate court also issued a separate order approving WF's SAA, which covered the period between the filing of the FAA and the SAA. The SAA listed Greer's assets and income as totaling $316,341.02, which included $231,587.10 in proceeds from the reverse mortgage loan on Greer's home. The SAA also listed Greer's expenses as totaling $276,922.51, which included $47,201.50 for Greer's stay at Hillcrest of Wayzata, $29,548.58 for Agewell Home Care, and $36,121.72 in closing costs for the reverse mortgage. The probate court appears to have treated Greer's petitions for appointment of successor conservator as an objection to the SAA. The probate court acknowledged Greer's objection, but nonetheless allowed the SAA, finding that

the expenses for Greer's care were large but not unreasonable.

On April 23, 2007, Greer, Michael, and Terry sent a letter to the probate court requesting a new trial. On April 26, 2007, the probate court sent a letter to Greer, Michael, and Terry refusing to grant the request for a new trial, stating that the request was untimely, but noting that the deadline for filing an appeal had not yet expired. The probate court urged Greer, Michael, and Terry to obtain legal advice about the possibility of filing an appeal. But Greer did not appeal the probate court's March 2, 2007 orders, even though they were appealable. *See* Minn.Stat. §§ 525.71(a)(2) (permitting appeal of orders removing or refusing to remove a guardian or conservator); 525.71(a)(9) (permitting appeal of order allowing or refusing to allow an account when amount in controversy exceeds $100).

On April 27, 2007, Greer filed another petition for restoration of capacity. On June 25, 2007, the probate court heard Greer's petition for restoration, and on July 6, 2007, the probate court determined that Greer was restored to capacity. The probate court found that there had been marked improvements in Greer's physical and mental health and her capacity to care for herself and handle her own affairs. The probate court discharged PFI without reservation, but it declined to discharge WF until it filed its final account.

While Greer's petition for restoration of capacity was pending, PFI filed its second personal well-being report (May 2007 report), and WF filed its interim account (IA). The May 2007 report stated that Greer's mental, physical, and social condition had improved greatly, that Greer had returned to her home, and that she had transitioned from receiving 24–hour home health care to living on her own and receiving visits from home-health-care work-ers a few times per week. PFI recommended that Greer be restored to capacity or that a family member be appointed successor guardian. Again, PFI notified Greer of her right to request (1) a change in her residence; (2) removal of PFI as guardian; or (3) modification or termination of the guardianship. Greer did not file any requests in response to the May 2007 report.

WF's IA listed Greer's assets as totaling $67,191.41, much of which had rolled over from the previous accounting period. WF listed Greer's expenses as totaling $52,680.34, which included $10,550.68 for Agewell Home Care. The IA also listed the balance of Greer's assets as $14,511.07.

In August 2007, WF filed its final account (FA), which listed Greer's assets and expenses as totaling $16,760.85. The FA also included a list of unsatisfied expenses totaling $48,388.62, which included $7,653.82 for Agewell Home Care. Shortly thereafter, Greer signed a consent to the IA and the FA. In the consent, Greer acknowledged that she had a right to consult with her attorney, that she had reviewed the accounts and had no objections, and that she was waiving any hearing on the accounts. In October 2007, the probate court allowed the FA and discharged WF. Greer did not appeal this order, even though it was appealable. *See* Minn.Stat. § 525.71(a)(9) (permitting appeal of order allowing or refusing to allow an account when amount in controversy exceeds $100).

### B. Conduct of PFI and Ostrom after the guardianship

Approximately 18 months after the guardianship/conservatorship was terminated, the *Minneapolis Star Tribune* newspaper contacted PFI concerning an article it was working on about Greer's case. PFI authorized Ostrom, as its attorney, to speak with the *Star Tribune*. Os-

trom did so, and Greer alleges that Ostrom disclosed confidential information about Greer in interviews with and a letter to a reporter from the *Minneapolis Star Tribune*. Greer also alleges that Ostrom likewise disclosed confidential information about Greer in a letter to an officer of the Minnesota Association for Guardianship and Conservatorship and in an article posted on the website of the Minnesota State Bar Association. Greer alleges that Ostrom made these disclosures on behalf of PFI.

### C. District court proceedings

In April 2009, Greer sued WF, PFI, and Ostrom. Greer alleges that WF and PFI obtained unnecessary out-of-home and at-home care for Greer, incurred unreasonable expenses for Greer's care, and failed to provide Greer with copies of her medical and financial documents. Greer contends that WF and PFI therefore breached their fiduciary duties, negligently performed their duties as conservator and guardian respectively, and intentionally or negligently inflicted emotional distress. At the heart of Greer's claims, however, are WF's and PFI's alleged breaches of fiduciary duties because Greer claims that WF and PFI were negligent and inflicted emotional distress by breaching their respective fiduciary duties to her.

Greer further alleges that Ostrom owed a fiduciary duty to Greer as the attorney of Greer's guardian PFI and that Ostrom breached that duty by disclosing confidential information to various third parties, including the *Minneapolis Star Tribune*, the Minnesota Association for Guardianship and Conservatorship, and the Minnesota State Bar Association.

PFI, WFB, and WFI moved to dismiss for failure to state a claim under Minn. R. Civ. P. 12.02, alleging that the claims were barred by the final orders filed in the conservatorship and guardianship proceedings, which were not subject to collateral attack. Ostrom filed a motion for judgment on the pleadings under Minn. R. Civ. P. 12.03, alleging that she owed no duty to Greer. The district court dismissed Greer's claims against WFI, finding that Greer had conceded WFI's argument that Greer had made no factual allegations against WFI. The district court also dismissed on the grounds of res judicata the claims against WFB and the claims against PFI to the extent that they were based on actions taken during Greer's guardianship. The district court granted Ostrom's motion for judgment on the pleadings on the ground that Greer could not hold Ostrom liable for any professional negligence or emotional distress because Greer was not Ostrom's client.

### ISSUES

I. Did the district court err in determining that Greer's claims against WF and PFI are barred as collateral attacks on the probate-court's orders or under the doctrine of res judicata?

II. Did the district court err in granting Ostrom's motion for judgment on the pleadings?

### ANALYSIS

#### I

We review de novo the district court's decision to grant a motion to dismiss for failure to state a claim upon which relief can be granted. *Hebert v. City of Fifty Lakes*, 744 N.W.2d 226, 229 (Minn.2008). We consider only the facts alleged in the complaint, accept those facts as true, and construe all reasonable inferences in favor of the non-moving party. *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn.2003). We are permitted, however, to consider documents that are

embraced by the complaint, including pleadings and orders in an underlying proceeding. *Rohricht v. O'Hare,* 586 N.W.2d 587, 589 (Minn.App.1998).

■ If a probate court has jurisdiction over a matter, its ruling "is not subject to collateral attack." *Bengtson v. Setterberg,* 227 Minn. 337, 349, 35 N.W.2d 623, 629 (1949). This rule applies to a probate court's orders regarding conservatorships and guardianships. *See Kelly v. Kelly,* 304 Minn. 237, 229 N.W.2d 526 (1975) (barring collateral attack on probate court order approving guardian's transfer of title to property); *Rickel v. Peck,* 211 Minn. 576, 2 N.W.2d 140 (1942) (barring collateral attack on probate court order allowing guardian's intermediate account); *Winjum v. Jesten,* 191 Minn. 294, 253 N.W. 881 (1934) (barring collateral attack on probate court order approving guardian's fees). Here, it is undisputed that the probate court had jurisdiction over Greer's conservatorship and guardianship proceedings. The parties disagree, however, on whether Greer's claims against WF and PFI constitute collateral attacks on orders issued in those proceedings.

■ A collateral attack includes "every proceeding in which the integrity of the judgment is challenged" in a separate action "except suits brought to obtain decrees declaring judgment to be void ab initio." *In re Wretlind,* 225 Minn. 554, 564, 32 N.W.2d 161, 168 (1948) (quotations omitted); *see Black's Law Dictionary* 298 (9th ed.2009) (defining a "collateral attack" as "[a]n attack on a judgment in a proceeding other than a direct appeal; esp., an attempt to undermine a judgment through a judicial proceeding in which the ground of the proceeding (or a defense in the proceeding) is that the judgment is ineffective"). Because it is undisputed that Greer's current action is distinct from the prior probate proceedings, whether her current action constitutes a collateral attack on the probate court's orders depends on whether she is challenging or seeking to undermine those orders. Greer argues that her current action is not a collateral attack because (1) she was incapacitated during her conservatorship and guardianship and therefore statutorily prohibited from asserting her claims; and (2) the facts supporting her claims were not addressed or otherwise disclosed in the probate court's orders. We address each argument in turn.

### A. Greer's ability to challenge WF's and PFI's actions

■ Greer contends that her claims against WF and PFI are not collateral attacks and cannot be barred because she was statutorily prohibited from bringing those claims during the conservatorship. Greer points out that a conservator has "the duty ... to institute suit on behalf of the protected person and represent the protected person in any court proceedings." Minn.Stat. § 524.5–417(c)(3) (2008). As such, Greer contends that during the conservatorship, WF—not Greer herself—had the right to assert any claims against WF and PFI.

Greer misreads Minn.Stat. § 524.5–417(c)(3), which grants a conservator the power to assert legal claims on behalf of an incapacitated person; it does not deprive the incapacitated person of the right to challenge the conduct of her conservator—or her guardian—in the probate court. *See* Minn.Stat. § 524.5–417(c)(3). In fact, the conservatorship and guardianship statutes contain numerous provisions to ensure that incapacitated persons are informed of, and may participate in, the proceedings. *See, e.g.,* Minn.Stat. § 524.5–308 (2008) (right to notice in guardianship proceedings); Minn.Stat. § 524.5–317(b) (Supp.2009) (right to petition for modifica-

tion or termination of guardianship); Minn.Stat. § 524.5–404 (2008) (right to notice in conservatorship proceedings); Minn.Stat. § 524.5–418(b) (2008) (right to notice and hearing on petition by conservator to sell, mortgage, or lease real estate); Minn.Stat. § 524.5–420 (Supp.2009) (right to notice and hearing on intermediate and final accounts by conservator); Minn.Stat. § 524.5–431(c) (2008) (right to petition for termination of conservatorship). Both the conservatorship and guardianship statutes also guarantee incapacitated persons the right to counsel in these proceedings. *See* Minn.Stat. § 524.5–304(b) (Supp.2009) (guardianship proceedings); Minn.Stat. § 524.5–406(b) (Supp.2009) (conservatorship proceedings). Incapacitated persons have frequently invoked these rights to challenge the conduct of their conservators and guardians in the probate court. *See, e.g., Matter of Conservatorship of Torres,* 357 N.W.2d 332 (Minn.1984) (appeal on behalf of ward from probate court order granting conservator's request to remove protected person's respirator); *In re Conservatorship of Grunlund,* 407 N.W.2d 141, 141–42 (Minn.App.1987) (appeal on behalf of ward from probate court order allowing conservator's intermediate account despite allegations of theft); *In re Conservatorship of Moore,* 409 N.W.2d 14, 16–17 (Minn.App.1987) (appeal on behalf of wards from probate court order allowing conservator's intermediate account despite allegations of misuse of assets under conservatorship). Thus, by itself, Greer's conservatorship did not preclude her from challenging the conduct of WF and PFI while she was subject to that conservatorship.

### B. Claims against WF (conservator)

■ A conservator must report to the court regarding the administration of an incapacitated person's estate annually, upon termination, and at any other times

as directed by the court. Minn.Stat. § 524.5–420(a). "A question of liability between the estate and the conservator personally may be determined in a proceeding for accounting." Minn.Stat. § 524.5–430(d) (2008). An order allowing an intermediate account after notice and hearing "adjudicates liabilities concerning the matters adequately disclosed in the accounting." Minn.Stat. § 524.5–420(a). Similarly, an order allowing a final account after notice and hearing "adjudicates all previously unsettled liabilities relating to the conservatorship." *Id.* A party can challenge orders allowing these accounts through a direct appeal, but not a collateral attack. *See* Minn.Stat. § 525.71(a)(9) (allowing appeal of orders allowing or refusing to allow an account when amount in controversy exceeds $100); *Rickel,* 211 Minn. at 584–85, 2 N.W.2d at 144–45 (barring collateral attack on orders allowing intermediate accounts); *Winjum,* 191 Minn. at 300, 253 N.W. at 884 (barring collateral attack on orders allowing final accounts).

Greer's current claims against WF, including her claims of self-dealing, mismanagement and waste arising from its conduct as her conservator, unquestionably relate to the conservatorship. Therefore, the probate court's order allowing the final account "adjudicate[d]" them to the extent they were not addressed in prior probate court orders. Minn.Stat. § 524.5–420(a). An order allowing an account not only confirms an incapacitated person's assets, income, and expenses, but it also adjudicates the propriety of the conservator's management of the incapacitated person's estate. *See Hoverson v. Hoverson,* 216 Minn. 237, 240, 12 N.W.2d 497, 499 (1943) (stating that passing on a guardian's accounting "involves not merely items of debit and credit, but also due consideration of the propriety of charges for services

rendered, and the like"). Here, the probate court allowed WF's final account, which functionally adjudicated any remaining liabilities relating to WF's administration of the estate, and Greer failed to appeal this order, which made it final. Because Greer's claims in the current action essentially challenge the propriety of actions by WF that the probate court approved in its orders allowing WF's accounts, those claims constitute collateral attacks on those prior orders, and are barred. *See Winjum*, 191 Minn. at 300, 253 N.W. at 884.

Further, we note that WF's intermediate accounts informed the probate court of the transactions that Greer characterizes as self-dealing, mismanagement, and waste by WF. The Minnesota Supreme Court has previously held that a plaintiff's claim against the former guardian of his property was a collateral attack on the probate court's order allowing the final account where that account disclosed the transaction plaintiff was challenging, the probate court allowed the final account—thereby approving the challenged transaction, and the probate court's order was final because the plaintiff failed to appeal it. *Wold v. People's Trust & Sav. Bank*, 179 Minn. 523, 524–26, 229 N.W. 785, 786–87 (1930).

The first annual account states that WF closed Greer's M & I investment accounts and opened Wells Fargo Bank investment accounts. The second annual account shows that WF obtained a reverse mortgage loan on Greer's home from Wells Fargo Bank. Together, the accounts also reveal that WF paid over two hundred thousand dollars for Greer to stay at a nursing home for almost two years and to receive home health care for several additional months. Clearly, Greer's current claims are a collateral attack on the probate court's orders. *See id.* (prohibiting collateral attacks on final accounts); *Rick-*

*el*, 211 Minn. at 584–85, 2 N.W.2d at 144–45 (stating that, in Minnesota, orders allowing intermediate accounts constitute final orders that cannot be collaterally attacked).

We also note that, in its order directing WF to obtain a reverse mortgage loan, the probate court approved WF's decision to obtain the reverse mortgage from Wells Fargo Bank, conduct that Greer alleges to constitute self-dealing. A conservator may file a petition for the mortgage of the real property of a protected person, and the probate court may grant the petition after notice and hearing. Minn.Stat. § 524.5–418 (2008). Here, WF petitioned to obtain a reverse mortgage loan on Greer's home to pay for her long-term care. Although the record is not entirely clear, it seems that Greer and her counsel appeared at the hearing on the petition but did not make any objections. The probate court found that the reverse mortgage of Greer's home was necessary; it directed WF to obtain a reverse mortgage loan on the property; and it specifically authorized WF to obtain the loan from Wells Fargo Bank. An order authorizing or refusing to authorize the mortgage of real estate is appealable. Minn.Stat. § 525.71(a)(3). Greer did not appeal this order, and it is now final. Further, no mortgage shall be "subject to collateral attack on account of any irregularity in the proceedings if the court which ordered the same had jurisdiction of the estate." Minn.Stat. § 524.5–418(j). Thus, even absent the orders allowing the accounts, Greer's claims against WF for obtaining the reverse mortgage loan from Wells Fargo Bank are barred. *See Kelly*, 304 Minn. at 241–42, 229 N.W.2d at 529 (holding that a probate court's order allowing a guardian to transfer a ward's interest in real estate to the guardian was not subject to collateral attack).

### C. Claims against PFI (guardian)

A guardian is required to draft an annual report on the condition of the incapacitated person. Minn.Stat. § 524.5–316(a). The report must address the incapacitated person's (1) mental, physical, and social condition; (2) living arrangements; (3) restrictions on communication and visitation; (4) receipt of medical, educational, vocational, and other services; and (5) need for continued guardianship or changes to the scope of the guardianship. *Id.* The guardian must submit the report to the probate court, and send notice of filing of the report to the incapacitated person. Minn.Stat. § 524.5–308(d). Unlike a conservator's accounts, however, the probate court need not approve or allow the guardian's annual reports. *See* Minn. Stat. § 524.5–316(a).

With respect to PFI, Greer claims that PFI failed to (1) properly reassess her condition; and (2) modify her living arrangements and health care as her condition improved. She also claims that PFI incurred unreasonable expenditures for her shelter and care. Despite the fact that PFI's reports are not the subject of any orders by the probate court approving or allowing those reports, we conclude that Greer's claims against PFI in the current action are also barred as collateral attacks.

PFI submitted its annual reports in April 2006 and May 2007. The April 2006 report stated that there was no change in Greer's mental, physical, or social condition or in her living arrangements between March 2005, when the guardianship commenced, and March 2006, when the reporting period ended. The April 2006 report also recommended no change to the scope of the guardianship. The May 2007 report, however, stated that, between March 2006 and May 2007, Greer's mental, physical, and social condition had improved, that she had returned from the nursing home to her home, and that she had progressed from receiving 24–hour home health care to living on her own and receiving home health care two or three times per week. The May 2007 report recommended that the probate court appoint a family member as successor guardian or restore Greer to capacity. Thus, PFI's reports address the conduct forming the basis for most of Greer's claims against PFI—they address whether there had been changes in Greer's condition, whether the changes necessitated modification of Greer's living arrangements and health care, and whether the guardianship should be continued, modified, or terminated. They are not, however, the subject of any final orders by the probate court. Thus, at first blush, it appears that the allowance of Greer's claims would not constitute collateral attacks on any of the probate court's orders specifically concerning PFI. But a closer analysis reveals otherwise.

In passing on a conservator's intermediate and final accounts, a probate court has the power to protect an incapacitated person by addressing whether a wrong suggested by an account actually exists and, if it does, to act accordingly. *Wold,* 179 Minn. at 526, 229 N.W. at 787. Here, the conservator's accounts reveal the expenditures made for Greer's shelter and care: the accounts disclose that $130,421.63 was paid for Greer's nursing home stay and $41,805.12 for her home health care. If the probate court thought it necessary, it could have inquired into the need for that level of care and ended any unwarranted arrangements. *See id.* Instead, the probate court allowed each of the accounts, essentially concluding that the expenditures incurred for Greer's care were reasonable. *See Hoverson,* 216 Minn. at 242, 12 N.W.2d at 500 (concluding that evidence sustained findings allowing guardian's account). Were Greer allowed

to proceed with her tort claims against PFI, she would effectively be challenging the necessity of expenditures that were approved by the probate court in the orders allowing the accounts. *See Wretlind,* 225 Minn. at 564, 32 N.W.2d at 168 (defining collateral attack). That is the essence of a collateral attack.

Greer contends that she is not attacking the probate court's orders but is instead alleging that WF and PFI negligently discharged their duties as conservator and guardian, respectively. Here, however, the effect of doing so successfully would be to undermine the probate court's orders allowing the conservator's accounts. Therefore, we conclude that Greer's claims against WF and PFI constitute collateral attacks on the probate court's orders and hence that the district court properly dismissed those claims.[5]

To the extent that Greer contends that WF or PFI failed to provide her financial or medical records, we construe Greer as generally challenging WF's or PFI's alleged failure to produce discovery in the probate court proceeding. Greer should have challenged any such failure in the probate proceeding itself and cannot do so here.

Finally, we note that, under appropriate circumstances, Greer could have requested the probate court to correct, modify, amend, or vacate its orders. *See* Minn. Stat. § 524.1–304(b) (2010) (reflecting slight modification of former Minn.Stat. § 525.02 (2004), which was probate code provision in effect at the commencement of Greer's conservatorship and guardianship). Namely, the probate court has the power to correct, modify, amend, or vacate its

orders (1) at any time, for the correction of a clerical error; (2) within the time for taking an appeal, for the correction of judicial error; (3) within two years of the discovery of "fraud, whether intrinsic or extrinsic, or misrepresentation"; or (4) within two years of the order in the event of "excusable neglect, inadvertence, or mistake." *Id.* Thus, had Greer believed that the probate court's orders were a result of a clerical or judicial error, fraud or misrepresentation, or inadvertence or mistake, Greer could have requested the probate court to take corrective action within the prescribed time period. What she cannot do, however, is to seek such redress by collaterally attacking the probate court's orders in an independent proceeding. *See Trapp v. Trapp,* 182 Minn. 537, 538–39, 235 N.W. 29, 29–30 (Minn. 1931) (stating that an order allowing a guardian's account can be attacked through a motion to reopen or vacate for fraud or mistake but is not otherwise subject to collateral attack).

## II

This court reviews de novo a district court's decision to grant judgment on the pleadings. *Nexus v. Swift,* 785 N.W.2d 771, 781 (Minn.App.2010). The review focuses on the allegations contained in the pleadings and any documents or statements incorporated by reference into the pleadings. *Id.* As with the review of the grant of a motion to dismiss, "all reasonable inferences must be drawn in [the nonmoving party's] favor," and "[a]ll facts alleged in the complaint must be taken as true." *Id.* (quotation omitted).

---

5. Because we conclude that Greer's claims against WF and PFI constitute collateral attacks on the probate court's orders, we need not address respondents' argument that res judicata bars Greer's claims and WF's argument that Greer released any claims against WF. Nor do we address amici's argument that PFI is not personally liable for its conduct during the guardianship.

Greer alleges that, as PFI's agent, Ostrom owed Greer the same fiduciary duty that PFI owed to Greer, and that as the attorney for PFI, Ostrom owed Greer the same duty of confidentiality she owed to PFI. Greer further alleges Ostrom violated these duties to Greer by disclosing confidential information about Greer without her consent. In her complaint, Greer described her claim against Ostrom as a claim for breach of fiduciary duty, but for the first time, at oral argument, her counsel recharacterized the claim as one for tortious publication of private facts. Because Greer has raised this theory for the first time on appeal, we limit ourselves to viewing Greer's claim against Ostrom as one for breach of fiduciary duty. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (stating that an appellate court generally will not consider matters not presented to and considered by the district court).

The district court interpreted Greer's claim against Ostrom as one for professional malpractice and granted Ostrom's motion for judgment on the pleadings on two grounds. First, the district court found that, because Greer was not Ostrom's client, Ostrom could not be liable to Greer for any professional negligence. Second, the district court found that, even if Ostrom could be liable to Greer, Ostrom could not be liable for damages for emotional distress in the absence of allegations of willfulness or malice. The district court did not address Ostrom's argument that Greer had alleged no fiduciary relationship between Greer and Ostrom because it granted judgment on the pleadings on other grounds.

We agree that Ostrom is entitled to judgment on the pleadings but on grounds different from those of the district court. First, however, we clarify the theory on which Greer seeks to recover from Ostrom. At oral argument before this court, Greer's counsel stated that Greer was seeking to hold Ostrom liable for disclosing confidential information about Greer based on Ostrom's role as PFI's agent.[6] Greer now relies on *Graff v. Robert M. Swendra Agency, Inc.*, 776 N.W.2d 744 (Minn.App. 2009), *review granted* (Minn. Mar. 16, 2010). In *Graff*, this court addressed the liability of an insurance agent for failure to procure insurance. Originally, the insured sued both the insurer and the agent. *Id.* at 747. The insured settled his claim against the insurer, and the agent argued that the settlement extinguished any claim against him. *Id.* at 747–48.

We reject Greer's argument. *Graff* establishes that an agent cannot shield herself from liability for a tortious act simply because she committed the act in her capacity as an agent. *Id. Graff*, however, does not establish any separate theory of liability for torts of an agent; it simply involved application of the ordinary rules of negligence and the recognition that one's status as an agent cannot function as a shield to liability for negligence. *Id.* Here, Greer has established that Ostrom cannot shield herself from liability for an allegedly tortious act against Greer simply because she performed it in her capacity as an agent for PFI. But Greer has abandoned any theory under which Ostrom would be liable to Greer for breach of PFI's alleged fiduciary duty.

6. Also at oral argument, Greer's counsel withdrew arguments based on Restatement (Third) of the Law Governing Lawyers § 51 (2000), which addresses the relationship between a guardian's attorney and the ward, and *Witzman v. Lehrman, Lehrman, & Flom*, 601 N.W.2d 179, 187 (Minn.1999), which addresses an attorney's liability for a client's torts.

For these reasons, we conclude that the district court properly granted Ostrom's motion for judgment on the pleadings.

## DECISION

Because Greer's claims against WF and PFI are improper collateral attacks on the probate court's orders and because Greer has stated no theory upon which Ostrom would be liable for a breach of fiduciary duty, the district court did not err in dismissing the claims against WF and PFI and granting Ostrom judgment on the pleadings.

**Affirmed.**